[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No.  13-14631

————————————————

D.C. Docket No. 1:12-cv-00694-CAP

ZANETA (JOI) RAINEY LIGHTFOOT,

Plaintiff - Appellant,

versus

HENRY COUNTY SCHOOL DISTRICT,

Defendant - Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(November 10, 2014)

Before WILSON and ROSENBAUM, Circuit Judges, and HUCK,* District Judge.

PAUL C. HUCK, District Judge:

Appellant Zaneta Lightfoot sued her former employer, Appellee Henry

County School District (the "School District"), in the Northern District of Georgia

_____

*Honorable Paul C. Huck, United States District Judge for the Southern District of
Florida, sitting by designation.

for alleged violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101 *et seq.*  The primary issue presented on appeal is whether the School District is an "arm of the State" of Georgia, such that it is immune from suit in federal court under the Eleventh Amendment.  We hold that the School District is not an "arm of the State," and instead operates more like a county or similar political subdivision to which Eleventh Amendment immunity does not extend. The district court's judgment on this ground is, therefore, reversed.  Its dismissal, on separate grounds, of Lightfoot's ADA retaliation claim is affirmed.

## I.    Facts and Procedural History

Lightfoot was hired by the School District in August 2007 and began teaching English and drama at Woodland High School ("Woodland") in 2008. [Appellant's Br. 4].  Lightfoot suffers from sickle cell anemia, a blood disorder that causes sporadic pain crises, making standing and walking difficult.  In March 2010, Lightfoot applied for intermittent leave under the FMLA, which would allow her to take leave on days when the pain from her medical condition became overwhelming.  Lightfoot's application was approved in October 2010, and she took leave throughout the 2010–2011 school year.  On February 14, 2011,

Lightfoot was approved for an additional period of intermittent FMLA leave. [*Id.* at 4–5].

On February 23, 2011, Woodland Principal Bret Cook and Assistant Principals Shannon Ellis and Molly Schmidt met with Lightfoot to give her a disciplinary document called a letter of redirection. [*Id.* at 5]. The letter stated that Lightfoot had neglected her duties under the "Georgia Teacher Duties and Responsibilities Instrument" (GTDRI) and violated specific requirements contained in the School District's "Annual Teacher Evaluation Addendum," including the requirements that teachers "interact[] in a professional manner with students, parents, and colleagues" and "provide[] adequate information, plans and materials for substitute teachers." [Doc. 54-4 at 1]. The letter described instances in which Lightfoot had violated these requirements by, among other things, "fail[ing] to work cooperatively with co-workers" and "fail[ing] to provide five days of substitute lesson plans." [*Id.*]. Lightfoot claims that at the meeting, Cook, Ellis, and Schmidt revealed that their true reason for issuing the letter was Lightfoot's use of FMLA leave. Cook stated that Lightfoot's medical absences had caused many of the problems described in the letter, and Ellis suggested that

3

Lightfoot transfer to a middle school because the high school's schedule was not compatible with her medical condition.[1]  [Appellant's Br. 6].

On March 28, 2011, Schmidt administered Lightfoot's performance evaluation.  Lightfoot received an overall evaluation of "unsatisfactory" for allegedly failing to correct the GTDRI deficiencies outlined in her letter of redirection.  [*Id.* at 6–7].  Because of her negative evaluation, Lightfoot was placed on a Professional Development Plan ("PDP").  A PDP is an "individually tailored educational and professional plan" containing specific objectives for improvement and criteria for measuring progress.  [Doc. 54-2 at 3; Doc. 71 at 3].  However, it is also the most severe form of discipline a teacher can receive short of being terminated.  [Appellant's Br. 8].  Lightfoot's PDP was in effect for the remainder of the 2010–2011 school year and for the following school year.  Around this time, Cook removed Lightfoot from her position as the school's cheerleading coach, a position she had held since 2009 and for which she received additional compensation.  On April 4, 2011, Lightfoot filed charges of disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").  [*Id.* at 8–9].

---

[1] While the School District disputes these and other statements allegedly made by Woodland's administration [*see* Appellee's Br. 9–11], the facts are to be construed in the light most favorable to the non-movant on review of a summary judgment order.  *Manders v. Lee*, 338 F.3d 1304, 1306 n.1 (11th Cir. 2003).

When Lightfoot returned to school for the 2011–2012 school year, she found that her English classroom, previously located across the hall from her drama classroom, had been moved to the other side of the building.  This required Lightfoot to take a painful walk between the distant classrooms.  Lightfoot requested an accommodation to reduce her walking, which Cook denied because Lightfoot did not appear to him to be in pain.  [*Id.* at 10–11].

After exhausting administrative remedies with the EEOC, Lightfoot brought the instant suit in March 2012, alleging discrimination and retaliation under the ADA and retaliation under the FMLA.  [*Id.* at 11; Doc. 71 at 5].  Shortly after filing suit, Lightfoot successfully completed her PDP.  However, several months later, she received a second letter of redirection based on allegations that she had falsified a student's grades.[2]  In March 2013, Cook informed Lightfoot that the School District would not be renewing her contract and that her employment was terminated.  [Appellant's Br. 13–14].

In July 2013, the district court granted the School District's motion for summary judgment on Lightfoot's ADA claims but denied it on her FMLA claim.  [Doc. 71 at 22–23].  The School District moved for reconsideration of the FMLA claim, raising for the first time the defense of Eleventh Amendment immunity.  Lightfoot moved for reconsideration of her ADA retaliation claim, and also moved

---

[2] An investigation yielded no evidence of grade falsification.  [Appellant's Br. 13].

to amend her complaint to add claims based on her termination.  On September 17, 2013, the district court granted the School District's motion for reconsideration and found that the School District was entitled to Eleventh Amendment immunity. [Doc. 80 at 3–11].  The court therefore granted the School District summary judgment on Lightfoot's FMLA claim and denied Lightfoot's motion to amend her complaint.  [*Id.* at 18].  On separate grounds, the district court also denied Lightfoot's motion for reconsideration of her ADA retaliation claim.  [*Id.* at 12–13].

On appeal, Lightfoot argues that the School District is not an "arm of the State" of Georgia, and is therefore not entitled to immunity under the Eleventh Amendment.  Lightfoot further argues that the district court erred in granting the School District summary judgment on her ADA retaliation claim.

## II.   Standard of Review

"[W]hether an entity constitutes an arm of the state under Eleventh Amendment immunity analysis is a question of law subject to *de novo* review." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 602 (11th Cir. 2014).  Lightfoot frames her second issue on appeal as whether the district court erred in granting the School District summary judgment on her ADA retaliation claim, which we would normally review *de novo*.  *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  However, Lightfoot's

argument that the district court should have liberally construed her ADA retaliation claim as being based on facts pled elsewhere in her complaint was raised in her motion for reconsideration.  We review the district court's disposition of that motion for abuse of discretion.  *See Farris v. United States*, 333 F.3d 1211, 1216 (11th Cir. 2003); *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1285 (11th Cir. 2001).

## III.   Analysis

### A.   Eleventh Amendment Immunity

"The Eleventh Amendment largely shields States from suit in federal courts without their consent . . . ."  *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 39, 115 S. Ct. 394, 400 (1994).[3]  Eleventh Amendment immunity "extends not only to the state itself, but also to state officers and entities when they act as an 'arm of the state.'"  *Lesinski*, 739 F.3d at 601.  It does not, however, extend to counties, municipal corporations, or similar political subdivisions of the state.  *Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499, 1509 (11th Cir. 1990) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 572 (1977)).  Thus, the School District's immunity under the Eleventh

---

[3] The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has held that the Eleventh Amendment also bars suits against a state by its own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504 (1890).

Amendment turns on whether it should be treated as an "arm of the State" of Georgia, or as a county or similar political subdivision.  *Mt. Healthy*, 429 U.S. at 280, 97 S. Ct. at 572.  This assessment is made "in light of the particular function in which [the School District] was engaged when taking the actions out of which liability is asserted to arise."  *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc).  Here, the relevant functions pertain to the School District's employment of teachers, and specifically, to its discipline, evaluation, and termination of teachers.

To determine whether an entity is an "arm of the state," we evaluate the following four factors:  "1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."  *Manders*, 338 F.3d at 1309.  The resolution of these factors depends, in part, on state law, *id.*, which differs from state to state.  Still, we note that the Supreme Court and the vast majority of appellate courts that have considered the issue have found that school districts and school boards are not entitled to Eleventh Amendment immunity.[4]

---

[4] *See Mt. Healthy*, 429 U.S. at 281, 97 S. Ct. at 573; *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1181 (9th Cir. 2003) (Alaska); *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1051 (9th Cir. 2003) (Arizona); *Herts v. Smith*, 345 F.3d 581, 588 (8th Cir. 2003) (Arkansas); *Rosa R. v. Connelly*, 889 F.2d 435, 438 (2d Cir. 1989) (Connecticut); *Gary A. v. New Trier High Sch. Dist.*, 796 F.2d 940, 944–47 (7th Cir. 1986) (per curiam) (Illinois); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 929 (7th Cir. 2012)  (Indiana); *Unified Sch. Dist. No. 480 v. Epperson*, 583 F.2d 1118, 1123 (10th Cir. 1978) (Kansas); *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 131 (5th Cir. 1986) (Louisiana); *Soper v. Hoben*, 195 F.3d 845, 853 n.9 (6th

This includes the Eleventh Circuit.[5]  By contrast, the School District identifies only one appellate case in which a school board was deemed an "arm of the state."  *See Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248 (9th Cir. 1992) (California).[6] Comparisons to these cases are provided when useful to our analysis.

### 1. *How State Law Defines the Entity*

The first *Manders* factor considers how Georgia defines its school districts. Georgia school districts are established by Georgia's Code, which provides that "[e]ach county of this state . . . shall compose one school district and shall be confined to the control and management of a county board of education . . . ."  Ga. Code Ann. § 20-2-50.  Georgia's Constitution vests authority in "county and area boards of education to establish and maintain public schools within their limits;

---

Cir. 1999) (Michigan); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 598 (5th Cir. 2006) (Mississippi); *Miener v. State of Mo.*, 673 F.2d 969, 980 (8th Cir. 1982) (Missouri); *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 237 (3d Cir. 2006) (New Jersey); *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 978 (10th Cir. 1997) (New Mexico); *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 251 (2d Cir. 2006) (New York); *Eason v. Clark Cnty. Sch. Dist.*, 303 F.3d 1137, 1141–45 (9th Cir. 2002) (Nevada); *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 226 (4th Cir. 2001) (North Carolina); *Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 331 n.6 (3d Cir. 2000) (Pennsylvania); *Lopez v. Hous. Indep. Sch. Dist.*, 817 F.2d 351, 353 (5th Cir. 1987) (Texas), *overruled on other grounds by Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (en banc); *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 997 (10th Cir. 1993) (en banc) (Utah); *Stoddard v. Sch. Dist. No. 1*, 590 F.2d 829, 835 (10th Cir. 1979) (Wyoming).

[5] *See Stewart*, 908 F.2d at 1511 (Alabama); *Travelers Indem. Co. v. Sch. Bd. of Dade Cnty.*, 666 F.2d 505, 509 (11th Cir. 1982) (Florida).  The former Fifth Circuit has similarly rejected Eleventh Amendment claims by local boards of education.  *See Moore v. Tangipahoa Parish Sch. Bd.*, 594 F.2d 489, 494 (5th Cir. 1979) (Louisiana); *Campbell v. Gadsden Cnty. Dist. Sch. Bd.*, 534 F.2d 650, 655–56 (5th Cir. 1976) (Florida); *Adams v. Rankin Cnty. Bd. of Educ.*, 524 F.2d 928, 929 (5th Cir. 1975) (per curiam) (Mississippi).

[6] As reflected in note 4, subsequent Ninth Circuit cases have declined to follow *Belanger*.

provided, however, that [this] authority . . . shall not diminish any authority of the General Assembly otherwise granted under this article . . . ."  Ga. Const. art. VIII, § V, ¶ I.  School districts are not explicitly defined as being either part of, or distinct from, the State.  This case is therefore unlike *Mt. Healthy*, where the Supreme Court found that Ohio school boards were not "arms of the state" in part because "[u]nder Ohio law the 'State' does not include 'political subdivisions,' and 'political subdivisions' do include local school districts."  *Mt. Healthy*, 429 U.S. at 280, 97 S. Ct. at 572.

Nevertheless, it is telling that Georgia courts have held that "[a] county board of education . . . is merely the agency through which the county, as a subdivision of the State, acts in school matters."  *Krasner v. Harper*, 82 S.E.2d 267, 272 (Ga. Ct. App. 1954); *see also Beckanstin v. Drake*, 80 S.E.2d 506, 507 (Ga. Ct. App. 1954).  Georgia courts have similarly observed that teachers are "county employees" by virtue of "being employees of the county governing authority through which the county acts in school matters (*i.e.*, the county board of education)."  *Rosser v. Meriwether Cnty.*, 186 S.E.2d 788, 791 (Ga. Ct. App. 1971) (per curiam).  This is in contrast to *Manders*, where we held that the sheriff's office was an "arm of the state" in part because it was a "separate and independent office" from the county, and its employees were not county employees.  *Manders*, 338 F.3d at 1319.

Furthermore, in discussing the powers of various government entities, Georgia's Constitution often groups school districts together with counties and municipalities, indicating that those entities are similar to one another, and distinct from the State.   For example, the section pertaining to "Intergovernmental Relations" provides that the "state, or any institution, department, or other agency thereof" may contract with "any county, municipality, school district, or other political subdivision of the state."   Ga. Const. art. IX, § III, ¶ I.   Similarly, the section discussing "Home Rule for Counties and Municipalities" states that the "General Assembly may waive the immunity of counties, municipalities, and school districts by law."   *Id.* § II, ¶ IX.   Finally, the section setting forth "Limitations on Local Debt" places a cap on the "debt incurred by any county, municipality, or other political subdivision of this state," while excepting "local school systems which are authorized by law . . . to incur debt in excess of [the cap]."   *Id.* § V, ¶ I.

Georgia's Code likewise groups school districts together with other political subdivisions.   The article governing "State and Local Government Partnership" states that its purpose is to "strengthen the partnership between the State of Georgia and local political subdivisions," and defines the latter to include counties, municipalities, and county school districts.   Ga. Code Ann. §§ 28-5-47.1 to -48. Similarly, the Code's title on "Local Government" provides that "[c]ounties,

municipalities, county boards of education, and other political subdivisions of the state . . . shall have the power and authority . . . to issue notes, certificates, or other evidence of indebtedness in anticipation of the collection of taxes."  Ga. Code Ann. § 36-80-2.  Although these various provisions are not definitive, they suggest that Georgia considers school districts to be political subdivisions, distinct from the State.[7]

The School District counters that Georgia courts have deemed school districts part of the State for purposes of state sovereign immunity, which extends to "the state and all of its departments and agencies."  Ga. Const. art. I, § II, ¶ IX; *see Coffee Cnty. Sch. Dist. v. Snipes*, 454 S.E.2d 149, 150 (Ga. Ct. App. 1995). The School District further notes that we have cautioned against "the incongruous result of having a 'state agency' that is immune from suit under state law but not federal law."  *Ross v. Jefferson Cnty. Dept. of Health*, 701 F.3d 655, 659 (11th Cir. 2012) (per curiam) (internal quotation marks omitted).

However, it is federal law, not state law, that ultimately governs whether an entity is immune under the Eleventh Amendment.  *See Stewart*, 908 F.2d at 1509. State-law immunity does not control our analysis, *id.*, particularly because Georgia

---

[7] The School District argues that the fact that Georgia refers to school districts as "political subdivisions" is not significant because Georgia's Supreme Court has referred to "political subdivisions" as "arms of the State," citing *Troup County Electric Membership Corp. v. Georgia Power Co.*, 191 S.E.2d 33, 37 (Ga. 1972).  [Appellee's Br. 17].  However, the School District points to no case in which a political subdivision was referred to as an "arm of the state" for Eleventh Amendment purposes.

also extends immunity to counties, which are clearly not immune under the Eleventh Amendment. *See Coffee Cnty. Sch. Dist.*, 454 S.E.2d at 150 (noting that counties are entitled to state sovereign immunity); *Stewart*, 908 F.2d at 1509 (explaining that the Eleventh Amendment "does not extend to counties"). Additionally, the Georgia Tort Claims Act, which waives the State's sovereign immunity under certain circumstances, explicitly excludes school districts from its definition of "State," which is defined as "the State of Georgia and any of its offices, agencies . . . and institutions, but does not include counties, municipalities, school districts, [or] other units of local government . . . ."  Ga. Code Ann. § 50-21-22.

Finally, the School District argues that it is an "arm of the State" because it carries out the State's constitutional duty to provide public education.  *See* Ga. Const. art. VIII, § I, ¶ I ("The provision of an adequate public education for the citizens shall be a primary obligation of the State of Georgia.").  The School District analogizes to *Lesinski*, where we found the South Florida Water Management District to be an "arm of the state" in part because Florida's water districts were "designed to perform a state function—water management and protection." *Lesinski*, 739 F.3d at 603.

However, it is not sufficient that the School District's powers and duties are derived from state law.

> [T]he Eleventh Amendment shields an entity . . . only when it is . . .
> the direct means by which the State acts . . . . In contrast, when a State
> creates subdivisions and imbues them with a significant measure of
> autonomy, such as the ability to levy taxes, issue bonds, or own land
> in their own name, these subdivisions are too separate from the State
> to be considered its "arms."

*Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 313, 110 S. Ct. 1868, 1877 (1990) (Brennan, J., concurring in part and concurring in the judgment); *see also Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1048 (9th Cir. 2003) (finding that Arizona school district with a substantial degree of autonomy did not perform a central government function, even though Arizona's Constitution mandated that its legislature "provide for the establishment and maintenance of a . . . public school system" (quoting Ariz. Const. art. XI, § I.A)).  As discussed in the following sections, Georgia grants its school districts a significant amount of autonomy.  On balance, the first factor indicates that the School District is not an "arm of the State."

## 2.  *The Degree of Control Maintained by the State*

The second factor examines where Georgia vests control over school districts.  Under Georgia law, school districts are subject to "the control and management" of county boards of education, which have the authority to "establish and maintain public schools within their limits" and make "rules to govern the county schools of their county."  Ga. Code Ann. § 20-2-50, -59; Ga. Const. art. VIII, § V, ¶ I; *see also Thornton v. Clarke Cnty. Sch. Dist.*, 514 S.E.2d 11, 13 (Ga.

14

1999) ("A local school board has broad discretion to control the operation of the school system . . . ."). County school board members are locally elected county residents. *See* Ga. Code Ann. § 20-2-51 ("No person shall be eligible for election as a member of a local board of education who is not a resident of the school district in which that person seeks election and of the election district which such person seeks to represent.").

As a result, Georgia school districts are largely under local control. Indeed, as explained by the Georgia Supreme Court, Georgia's Constitution "embodies the fundamental principle of exclusive local control of general primary and secondary ('K–12') public education." *Gwinnett Cnty. Sch. Dist. v. Cox*, 710 S.E.2d 773, 775 (Ga. 2011). The constitution "limit[s] governmental authority over the public education of Georgia's children to that level of government closest and most responsive to the taxpayers and parents of the children being educated." *Id.* at 776.

In addition to being locally operated and controlled, Georgia's school districts and school boards have substantial autonomy over their affairs. School districts may sue and be sued. *Foster v. Cobb Cnty. Bd. of Educ.*, 213 S.E.2d 38, 39 (Ga. Ct. App. 1975). School boards may purchase property, borrow money, enter contracts, and issue bonds. *See* Ga. Code Ann. §§ 20-2-520, -390, -500, -

430.[8]  Similar powers were considered evidence of autonomy in *Mt. Healthy*, 429 U.S. at 280–81, 97 S. Ct. at 573 (school board could issue bonds and levy taxes within certain state law restrictions), and *Stewart*, 908 F.2d at 1510–11 (school board could issue tax anticipation warrants, borrow funds, and establish education policy).  *See also Moore v. Tangipahoa Parish Sch. Bd.*, 594 F.2d 489, 493–94 (5th Cir. 1979) (school board with power to sue and be sued, contract, purchase and sell property, borrow funds, and levy taxes deemed autonomous political subdivision).

The School District argues that Georgia nonetheless exercises significant control over school districts by setting rules and regulations for school boards and establishing statewide education policies.  The School District notes, for example, that the State establishes the qualifications and duties of school board members, the manner in which they are elected, their terms of office, and the basic procedures for their meetings.  *See* Ga. Code Ann. §§ 20-2-49, -51, -52, -57–58.  The State also gives the Governor authority to suspend board members if a school becomes at risk of losing its accreditation.  *Id.* § 20-2-73.

---

[8] Specifically, Georgia's Code authorizes school boards to, *inter alia*, "purchase, lease, or rent school sites" and other school property, Ga. Code Ann. § 20-5-520; "borrow sufficient amounts of money . . . to pay for the operation of the public schools," *id.* § 20-2-390; enter "contracts for . . . supplies, materials, equipment, or agricultural products," *id.* § 20-2-500; and "incur any bonded debt for building, equipping, or purchasing sites for . . . schoolhouses," *id.* § 20-2-430.

Moreover, the School District contends, Georgia has exercised increasing control over education policy since the enactment of the Quality Basic Education Act ("QBE") in 1985.  The QBE's stated purposes include:

> Providing an equitable public education finance structure which ensures that every student has an opportunity for a quality basic education, regardless of where the student lives, . . . [e]stablishing . . . state-wide standards which ensure that each student has access to a quality program[,] . . . [and] [p]roviding an evaluation process for all school system personnel to assure the public that personnel are performing at acceptable levels . . . .

Ga. Code Ann. § 20-2-131.

The QBE sets forth a framework for funding basic education in Georgia's public schools.  Specific provisions of the QBE also establish minimum salaries for teachers, standards for teacher certification, graduation requirements, and a statewide core curriculum.  *See* Ga. Code Ann. §§ 20-2-140, -142, -200, -212.[9] The QBE further requires school districts to submit their budgets to the State Board of Education ("State Board"), which "either accept[s] or reject[s]" the budgets. Ga. Code Ann. § 20-2-167.  School districts must spend at least sixty-five percent of their total operating expenditures on items "directly associated with the interaction between teachers and students," such as teacher salaries, school supplies, and classroom activities.  *Id.* § 20-2-171.  The State's Office of Planning

---

[9]  *See also* Chris Grant, *Education Reform*, New Georgia Encyclopedia, http://www.georgiaencyclopedia .org/ articles/education/education-reform#The-Quality-Basic-Education-Act (last updated Oct. 8, 2014).

and Budget is authorized to "verify the proper expenditure of funds" by school districts. *Id.* § 20-2-68. Finally, the State Board may withhold state funds from any school district that fails to comply with the QBE. *Id.* § 20-2-243.

The School District contends that these and similar regulations demonstrate the State's "immense control" over Georgia's school districts. The School District further argues that in addition to exercising general control, the State controls the particular functions at issue here: the evaluation, discipline, and termination of teachers.

The School District notes that Georgia requires teachers to be evaluated on an annual basis using an "evaluation system as adopted and defined by the State Board of Education." Ga. Code Ann. § 20-2-210. The evaluation must be based on several criteria, including growth in student achievement and observations of the teacher's classroom, *id.*, and a teacher who receives an "unsatisfactory" evaluation must be placed on a PDP. [Appellee's Br. 27 n.7]. The State also regulates the termination of teachers by specifying only eight statutory bases for terminating or not renewing a teacher's contract. A school board's termination decision may be appealed to the State Board. Ga. Code Ann. §§ 20-2-940, -942, -1160.

The School District correctly asserts that Georgia has enacted many laws pertaining to the operation of school districts. However, these laws do not

establish the requisite control for Eleventh Amendment purposes.  As an initial matter, many of Georgia's laws prescribe minimum requirements that school districts may exceed.  For example, while a school district must base its curriculum on the "uniformly sequenced core curriculum" established by the State Board, it may "sequence, expand, and enrich this curriculum to the extent it deems necessary and appropriate for its students and communities."  Ga. Code Ann. § 20-2-140.  Similarly, the State prescribes only minimum salaries for teachers, and provides that "[l]ocal units of administration may supplement the salaries of personnel subject to the schedule of minimum salaries."  *Id.* § 20-2-212.  Establishing minimum requirements is not sufficient to demonstrate control.  *See Savage*, 343 F.3d at 1045 ("[I]f prescribing minimum standards were the measure of a 'central government function,' then school districts would doubtless be considered an arm of the federal government, as well, by virtue of such statutes as the No Child Left Behind Act of 2001 . . . .").

Furthermore, other courts have found regulations similar to Georgia's insufficient to establish state control over a school district.  In *Savage*, the court described the many aspects of public education controlled by Arizona's state board:

> [T]he state board sets uniform statewide courses of study and competency requirements for promotion and graduation of students and controls certification of teachers, approves standardized tests, and prescribes criteria for determining students' English proficiency. . . .

> Arizona defines on a state-wide basis attendance requirements, circumstances when students may be expelled, and procedures for student discipline.

*Id.* (internal citations omitted).   Notwithstanding these regulations, the court concluded that the state did not exercise centralized government control over its school districts because the districts retained substantial autonomy.  *Id.* at 1048; *see also Duke v. Grady Mun. Schs.*, 127 F.3d 972, 979 (10th Cir. 1997) (finding that school board had local control even though New Mexico's laws empowered the state board to determine public school policy and exercise general authority over schools, including the authority to establish standards regarding curriculum, teacher accreditation and qualifications, and graduation requirements).

Moreover, while state approval of an entity's budget may sometimes "evidence[] state control," *Williams v. District Board of Trustees of Edison Community College, Florida*, 421 F.3d 1190, 1194 (11th Cir. 2005), it does not do so here because Georgia's school districts exercise considerable autonomy over local fundraising, as discussed under the third factor.  *See Stewart*, 908 F.2d at 1510–11 (finding that Alabama school board with substantial financial autonomy was not an "arm of the state," even though it was required to submit its budget to the state superintendent for approval).

The School District also overstates Georgia's control over the evaluation and discipline of teachers.  Although the State Board's evaluation system provides

20

detailed guidelines for the teacher evaluation process, it appears that many of these guidelines only establish minimum requirements, as evidenced by the fact that the School District itself utilizes its own addendum to the State's evaluation form. [*See* Doc. 54-5 at 2] ("Henry County Schools Annual Teacher Evaluation Addendum").  Moreover, while the evaluation system identifies broad criteria for evaluation (*e.g.*, whether the teacher "[p]rovides effective feedback . . . on student performances"[10]), the actual observation and assessment of teachers is performed by local officials.  *See* Ga. Code Ann. § 20-2-210 ("The superintendent of each local school system shall identify an appropriately trained evaluator . . . .").  In the event that a teacher "disagrees with the evaluation procedures or results," but the dispute does not involve termination or reprimand, the teacher may raise the issue with the local superintendent, but the "[l]ocal decision[] [is] not appealable to the Georgia Board of Education."[11]

Additionally, the school board exercises broad discretion over the formal discipline of teachers.  For example, a school superintendent may "write a letter of reprimand . . . for any valid reason."  Ga. Code Ann. § 20-2-944.  Similarly, while a teacher may only be terminated or non-renewed for eight statutory reasons, one of those reasons is "[a]ny other good and sufficient cause."  *Id.* § 20-2-940.  This

---

[10] Ga. Dep't of Educ., *CLASS Keys Process Guide: Georgia's Teacher Evaluation System* 53 (2011),                                    http://www.gadoe.org/School-Improvement/Teacher-and-Leader-Effectiveness/Documents/CLASS-Leader Keys/CK Process Guide 3-23-2011.pdf

[11] Ga. Dep't of Educ., *supra* note 10, at 34.

gives the school board significant discretion over its disciplinary decisions. Furthermore, its decisions are binding unless a party appeals to the State Board, and even then, the State Board's review is not *de novo*. Indeed, "the state board . . . shall [not] consider any question in matters before the local board nor consider the matter *de novo*, and the review by the state board . . . shall be confined to the record." *Id.* § 20-2-1160. The State Board must sustain the county board's findings if there is "any evidence" to support them. *See Moulder v. Bartow Cnty. Bd. of Educ.*, 599 S.E.2d 495, 497 (Ga. Ct. App. 2004).

Finally, one disciplinary action of which Lightfoot complains is her removal as cheerleading coach. The School District does not indicate how, if at all, this matter is regulated by the State. For these reasons, the second *Manders* factor also indicates that the School District is not an "arm of the State."

### 3. *Where the Entity Derives its Funds*

The third factor examines where the School District derives its funds. Georgia school districts receive federal, state, and local funding. Ga. Code Ann. §§ 20-2-160–171. To raise local funds, county school boards may certify property taxes to be levied by county authorities, borrow money, issue bonds, accept donations, and levy a sales tax. *See* Ga. Const. art. VIII, § VI, ¶¶ I, IV; Ga. Code Ann. §§ 20-2-390, -430, -74. Lightfoot argues that Georgia's school boards are similar to Ohio's, which the Supreme Court described as having "extensive powers

to issue bonds and to levy taxes within certain restrictions of state law." *Mt.*

*Healthy*, 429 U.S. at 280, 97 S. Ct. at 573 (internal citation omitted).

The School District, on the other hand, argues that its ability to raise local funds for operational expenses, such as teachers' salaries, is quite limited. The School District notes that Georgia's Constitution imposes a twenty mill cap on local property taxes for educational use, Ga. Const. art. VIII, § VI, ¶ I, which the School District has already reached. Furthermore, while the School District has the power to issue bonds, it may do so only for "building, equipping, or purchasing sites for the building and equipping of schoolhouses," Ga. Code Ann. § 20-2-430, and not for operational expenses. Similarly, it may levy only a one percent sales tax, and those tax revenues may be used only for capital outlay projects or the retirement of debt related to such projects. Ga. Const. art. VIII, § VI, ¶ IV. Finally, while the School District may borrow money for operational expenses, state funds would be used to repay the loans because the School District has already levied the maximum authorized property tax.

As a result, the School District relies heavily on state funding provided under the QBE, which constitutes sixty-five percent of the School District's budget. The QBE aims to fund basic education for all Georgia students. In broad terms, it sets a minimum level of funding for each school district based on the number of students in the district. To receive state funding, the school district

must levy a five mill property tax (the "local five mill share") and put the revenue toward the minimum amount.  The State then funds the remainder of the minimum amount.  [Appellee's Br. 34–35].[12]  In addition to funding basic education, the QBE also provides for "equalization grants" to address the fact that the amount of revenue generated from a mill of property taxes will vary from district to district. These grants equalize, to a limited extent, the revenue generated from property taxes above five mills.

The School District argues that the QBE's funding scheme is similar to the Florida water management districts' funding scheme in *Lesinski*.  There, we found that the third factor did not cut against finding immunity—even though the water districts were "empowered to levy ad valorem taxes, issue bonds, buy land, and borrow money"—because the state provided "a significant, albeit fluctuating" portion of their funding, and because the state's funding mechanism sought to "harmonize the regional impact of water management district projects on the State's natural resources with the fact that preservation and management of these resources is crucial to all residents, not just those who are affected locally." *Lesinski*, 739 F.3d at 604.  Similarly, the School District contends, the QBE's funding for basic education provides a "significant" portion of the School District's

---

[12] *See also* Ross Rubenstein & David L. Sjoquist, *Financing Georgia's Schools: A Primer* 11–15 (2003), http://aysps.gsu.edu/sites/default/files/documents/frc/report87.pdf.

budget, and its equalization grants aim to balance education funding across Georgia's school districts.

The School District further argues that the twenty mill cap on property taxes makes QBE funding analogous to the funding scheme in *Belanger.*  In *Belanger*, the Ninth Circuit found that California's school districts were "arms of the state" because California exercised "strict state control of public school funding." *Belanger*, 963 F.2d at 252.  Specifically, after California's Supreme Court held that the state's constitution required "strict statewide equalization of school spending per pupil," California adopted a scheme whereby:

> The state sets a revenue limit for each school district based on average attendance, subtracts property tax revenues from that limit, and allocates the balance to the school district from the state school fund. In short, the state determines the amount of money that school districts may spend per pupil and then provides the necessary state funds.

*Id.* at 251–52 (internal citations omitted).  Subsequent Ninth Circuit cases have distinguished *Belanger* based on the uniqueness of California's funding system. *See, e.g.*, *Savage*, 343 F.3d at 1042–44; *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1182–83 (9th Cir. 2003); *Eason v. Clark Cnty. Sch. Dist.*, 303 F.3d 1137, 1142 (9th Cir. 2002).  The School District argues that Georgia, like California, exercises strict control over public school funding, and its school districts should therefore be considered "arms of the State."

25

The School District's arguments, though ostensibly of some merit, are ultimately unavailing.  First, it is not sufficient that the School District receives significant funding from the State.  *See Mt. Healthy*, 429 U.S. at 280, 97 S. Ct. at 573 (finding no Eleventh Amendment immunity even though Ohio's school boards received a "significant amount of money from the State"); *Holz*, 347 F.3d at 1182, 1189 (finding no Eleventh Amendment immunity even though the state provided ninety-eight percent of the school district's budget).[13]

Furthermore, *Lesinski* is distinguishable.  In *Lesinski*, we merely found that because the first two *Manders* factors clearly indicated that Florida's water management districts were "arms of the State," their funding mechanism did not create "*such* autonomy in the District so as to . . . strip the District of its insulation from suit in a federal forum."  *Lesinski*, 739 F.3d at 605 (emphasis added).  We did not find that the funding mechanism independently favored "arm of the state" status.  Here, the first two *Manders* factors do not clearly favor the School District; thus, the School District cannot selectively rely on this portion of the *Lesinski* analysis.

Finally, the School District's reliance on *Belanger* is misplaced, as that case is of limited persuasive authority and involved a materially different funding

---

[13]  It appears that most school districts receive at least some, if not significant, state funding.  *See* Rubenstein & Sjoquist, *supra* note 12, at 9 ("Virtually every state maintains a system of state grants to local school systems to fund educational expenditures.").  However, almost none have been granted Eleventh Amendment immunity.  *See supra* note 4 and accompanying text.

scheme.  Unlike California, Georgia does not equalize or set a maximum limit on funding per student.  Instead, it guarantees a minimum amount of funding per student, to which school districts must contribute a five mill share.  School districts are free to levy property taxes above five mills.  Contrary to the School District's assertion, Georgia's twenty mill cap on property taxes is not "almost identical" to California's revenue limits in *Belanger*.  [Appellee's Br. 40].  Whereas California strictly limited the amount of local revenues school districts could raise, Georgia school districts are free to raise revenues exceeding the basic education amount by levying five to twenty mills in property taxes, issuing bonds, and borrowing money.  Moreover, the twenty mill cap is not a hard limit; the cap may be increased by the school board with approval from the majority of voters in the school district.  Ga. Const. art. VIII, § VI, ¶ II.  Thus, the fact that the School District has already levied a twenty mill property tax is not a significant factor. Nor is the fact that the School District may only use revenues from bonds and sales taxes for non-operating expenses.  Presumably, by utilizing those sources of funding, any property tax revenue that would otherwise have gone toward, *e.g.*, capital outlays, could instead be put toward operating expenses such as teacher salaries.

In short, Georgia school districts are not "arms of State" under the analysis in *Lesinski* or *Belanger*. Instead, they have local fundraising capabilities similar to the school board in *Mt. Healthy*. Accordingly, the third factor favors Lightfoot.

### 4. *Responsibility for Judgments*

The final *Manders* factor examines whether the State would bear ultimate responsibility for an adverse judgment against the School District. As the district court found, and neither party disputes, "[t]here is no obligation for the state to pay any judgment against [the School District]." [Doc. 80 at 9]. Nonetheless, the School District argues that because its budget is comprised largely of state funds, the fourth factor should lean in its favor under our analysis in *Lesinski* and *Manders*.

In *Lesinski*, we found that although an adverse judgment would be enforceable against the water management district, the state's treasury would still be directly implicated because if judgment creditors "deplete[d] the District's funds to the point that it can longer effectively function, the State would ultimately have to choose between increasing its appropriation . . . or shirking its constitutionally mandated duty" to protect the state's natural resources. *Lesinksi*, 739 F.3d at 605. Thus, we concluded that the fourth factor favored immunity. The School District argues that *Lesinski*'s analysis is directly applicable here, because if a large judgment were assessed against the School District, the State would

either have to increase its funding or shirk its duty to provide an adequate public education.

In *Manders*, we similarly found that although Georgia would not be liable for a judgment against the sheriff in his official capacity, state funds would still be implicated in the event of a "significant adverse judgment," because the sheriff would need to seek additional funding from the State, which supplied a portion of his budget.  Thus, we found that the fourth factor "at a minimum, . . . [did] not defeat" the sheriff's immunity claim.  *Manders*, 338 F.3d at 1327–28.

In both *Lesinski* and *Manders*, we emphasized that the first two factors clearly favored finding immunity, indicating that the entities at issue were closely related to the state.  This emphasis was reflected in our analysis of the fourth factor in those cases.   In *Lesinski*, the plaintiff argued that the water management district's "self-insurance fund" ensured that only the district, and not the state, would pay for an adverse judgment.   We rejected that argument because it "'detach[ed] the importance of a State's legal liability for judgments against a state agency from its moorings as an indicator of the relationship between the State and its creation.'"  *Lesinski*, 739 F.3d at 605 (quoting *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 430–31, 117 S. Ct. 900, 904–05 (1997)).  In *Manders*, we noted that one purpose of the Eleventh Amendment is to respect the integrity of the state, and

that a state's integrity "is not limited to who foots the bill."  *Manders*, 338 F.3d at 1328.

Here, by contrast, the first two factors do not so strongly favor finding that the School District is an "arm of the State" so as to implicate concerns about the State's integrity or the "relationship between the State and its creation."  Rather, those factors establish that the School District is a political subdivision with significant local control.  Thus, this case is more akin to *Stewart*, as the School District's fiscal autonomy means that "it cannot be said that a judgment against [the School District] will come from state funds."  *Stewart*, 908 F.2d at 1510–11.  Thus, the fourth factor indicates that the School District is not an "arm of the State."

In summary, the *Manders* analysis establishes that the School District is not an "arm of the State" of Georgia entitled to Eleventh Amendment immunity.  We reverse the judgment of the district court on this ground and remand for further proceedings.

## B.    Lightfoot's ADA Retaliation Claim

In her second issue on appeal, Lightfoot contends that the district court erred in granting the School District summary judgment on her ADA retaliation claim. Count IV of Lightfoot's complaint alleged retaliation under the ADA, stating:

> In February 2011, Plaintiff engaged in protected activity under the ADA[] when she told Defendant that she believed she was being

disciplined more harshly than her non-disabled coworkers because of her disability. Immediately thereafter, Defendant began to retaliate against Plaintiff for engaging in protected conduct.

[Doc. 7 ¶¶ 78–79].  Her ADA count contains no allegation that Lightfoot engaged in protected conduct by requesting FMLA leave.  By contrast, Count V, alleging retaliation under the FMLA, stated that "[b]y disciplining Plaintiff more harshly than her coworkers who have not taken medical leave . . . Defendant retaliated against Plaintiff for exercising her rights under the FMLA."  [*Id.* ¶ 86].

In analyzing Count IV, Lightfoot's ADA retaliation claim, the district court found that Lightfoot presented no evidence that she had in fact complained to school administrators about being disciplined.  Therefore, the court concluded that she had not established a *prima facie* case of retaliation, and granted the School District's motion for summary judgment.  [Doc. 71 at 15–16].

On appeal, Lightfoot argues that the district court should have construed her allegations regarding her request for intermittent FMLA leave, which formed the basis of her FMLA count, as also forming a basis for her ADA retaliation count. She contends that, even though these allegations were not specifically included in her ADA count, they were sufficiently set forth elsewhere in her complaint, where she alleged that:  (1) she requested and was granted FMLA leave to accommodate her disability, (2) the School District "discriminated and retaliated against her . . . because of her use of medical leave and her disability," and (3) she suffered

adverse employment action because she took FMLA leave. [Doc. 7 ¶¶ 1, 23–25, 29–36, 84–90]. Lightfoot further contends that the district court erred because, in her opposition to the School District's summary judgment motion, she expressly argued that her request for FMLA leave was protected conduct under the ADA, for which she suffered retaliation.

The district court did not abuse its discretion by declining to construe Lightfoot's ADA retaliation claim as being based on different facts than the ones actually pled in her ADA count. Even when construed liberally, Lightfoot's complaint did not give the School District notice that her ADA retaliation claim was based on her request for FMLA leave. Indeed, Count IV, her ADA retaliation count, was expressly and solely based on her complaint to administrators, while Count V, her FMLA retaliation count was expressly based on her use of FMLA leave. The general allegations that appear elsewhere in the complaint merely supported Lightfoot's FMLA retaliation count, and did not put the School District on notice that they also pertained to her ADA retaliation count. The School District properly responded to, and the district court properly relied on, Lightfoot's ADA count as it was pled. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint."); *cf. Bogovich v. Sandoval*, 189 F.3d 999,

1001 (9th Cir. 1999) ("[C]ourts should not undertake to infer in one cause of action when a complaint clearly states a claim under a different cause of action.").

Finally, the district court did not err in declining to consider this new factual basis when it was raised in Lightfoot's opposition to summary judgment. "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour*, 382 F.3d at 1315. Accordingly, the district court's grant of summary judgment to the School District on this claim is affirmed.

## IV.   Conclusion

For the reasons explained herein, the district court's judgment is reversed in part, and the case is remanded for further proceedings.

33

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 10, 2014

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  13-14631-FF
Case Style:  Zaneta Lightfoot v. Henry County School District
District Court Docket No:  1:12-cv-00694-CAP

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs